UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

FRANCISCO J. JAYME and                                    Case No. 15-10504-tl7
ALICIA ROJAS,

      Debtors.

JOE JESS MONGE and
ROSANA ELENA MONGE,

      Plaintiffs,

v.                                                        Adv. No. 15-1079-t

FRANCISCO J. JAYME and
ALICIA ROJAS,

      Defendants.

## **OPINION**

Before the Court is Plaintiffs' request that Defendants' discharge be denied under 11 U.S.C. §§ 727(a)(2)(A) and/or (a)(4)(A). The parties appeared pro se for trial, and did the best they could to present their positions. The Court has reviewed the admitted trial exhibits, taken judicial notice of the dockets in this and related bankruptcy cases and adversary proceedings, reviewed a lengthy and well-reasoned decision by another federal court concerning the same parties, and carefully weighed the testimony of the trial witnesses. The Court concludes that Defendants made false oaths in their bankruptcy petition, schedules, and "SOFA"[1] and gave false trial testimony, all about material facts, and with fraudulent intent. The Court therefore will deny Defendants' discharge under §§ 727(a)(2)(A) and (4)(A).

---

[1] Statement of Financial Affairs.

## I.    FACTS

The Court finds the following facts:[2]

1.    The 105 Thoroughbred House.

In November 2002, defendants Francisco Javier Jayme and Alicia Rojas bought a house in Santa Theresa, New Mexico, with a street address of 105 Thoroughbred Court (the "Thoroughbred House" or the "House"). Defendants financed the purchase of the House with a mortgage loan from Chase Manhattan Mortgage Co.[3] Defendants fell behind on their mortgage payments almost immediately. In fact, it is not clear if Defendants ever made a mortgage payment.

2.    The Foreclosure Action and Defendants' First Four Bankruptcy Cases.

Mr. Jayme filed a chapter 13 case on June 27, 2003, in the Western District of Texas (no. 03-31671). Ms. Rojas was not identified as a non-filing spouse.[4] On the petition date, Defendants were behind on their Thoroughbred House mortgage by about $25,000.[5] Mr. Jayme confirmed a chapter 13 plan on November 14, 2003. The case was dismissed on July 22, 2004, for failure to make plan payments.

On April 19, 2004, Citibank brought an action in state court, seeking to foreclose its first

---

[2] The Court took judicial notice of the docket in this bankruptcy case and in the federal and state cases involving the parties, including Plaintiffs' bankruptcy case and adversary proceeding and Defendants' five other bankruptcy cases. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket"). In addition, some of the Court's findings are taken from the facts found in the Texas Adversary Proceeding (as defined below). The doctrine of issue preclusion applies with respect to the Texas Adversary Proceeding. *See Monge v. Jayme (In re Jayme),* 2017 WL 2533340, at **3-4 (Bankr. D.N.M.).

[3] Later assigned to Citibank, N.A.

[4] The Court does not have all of the filings in this case. However, in response to SOFA #16, Mr. Jayme averred that he had no issue.

[5] According to Mr. Jayme's bankruptcy schedule J, the monthly mortgage payment was $3,594. The $25,000 arrearage means that Defendants were seven months in arrears on Mr. Jayme's petition date, which was about seven months after Defendants bought the Thoroughbred House.

Case 15-01079-t    Doc 201    Filed 06/29/18    Entered 06/29/18 15:05:32 Page 2 of 26

mortgage on the Thoroughbred House (the "Foreclosure Action"). The state court entered a default judgment on July 27, 2004. A special master's sale was scheduled for October 26, 2004.

Mr. Jayme filed a second chapter 13 case on October 25, 2004, in New Mexico (no. 04-17779).[6] He did not disclose his 2003 bankruptcy case. Ms. Rojas was listed as his non-filing spouse. The case was dismissed on January 19, 2005. Mr. Jayme never filed schedules or statements.

Mr. Jayme filed a third chapter 13 case on January 31, 2005, in New Mexico (no. 05-10619). He disclosed case number two, but not his first case. Ms. Rojas was again listed as the non-filing spouse. Mr. Jayme dismissed the case on July 26, 2005, without confirming a plan or making any plan payments.

In the Foreclosure Action, the special master's sale had been rescheduled for November 1, 2005. Mr. Jayme filed a fourth chapter 13 bankruptcy case on that date, in New Mexico (no. 05-51020). The case was dismissed on December 22, 2005, for Mr. Jayme's failure to abide by the Court's order to pay $11,111.11 to the chapter 13 trustee. The fourth bankruptcy case did not stop the special master's sale of the Thoroughbred House. On January 9, 2006, the state court entered an order approving the special master's report, which completed the transfer of title and started Defendants' redemption period.

3.    Sale/Leaseback of Thoroughbred Property.

At the same time Defendants were losing the Thoroughbred House to foreclosure, they

---

[6] Mr. Jayme apparently convinced his bankruptcy attorney to file the case by giving him a check for $3,146.50. According to the attorney (set out in a motion to withdraw, filed two weeks after the petition date), the check bounced. When asked about it, Mr. Jayme admitted that he never intended the check to clear, and that "he lied to counsel just so that the case would be filed thereby terminating the foreclosure auction." The attorney also alleged that Mr. Jayme "has not been truthful with counsel." Mr. Jayme never responded to the allegations. The motion to withdraw was granted.

were trying to get Plaintiffs to buy the house for $775,000. On or about February 3, 2006, the parties closed a sale-leaseback transaction. Plaintiffs borrowed $697,000 from America's Wholesale Lender, a mortgage loan arranged by Ms. Rojas.[7] The balance of the purchase price was financed by a loan from a Mr. Edward Abraham.[8] Unbeknownst to Plaintiffs and the mortgage lender, at closing Defendants were no longer able to convey marketable title to the house. However, Defendants used the sale proceeds to redeem the Thoroughbred House.[9] They then re-recorded the deed to the property, essentially curing the fraud perpetrated on Plaintiffs and the mortgage lender. At the end of the day, Plaintiffs obtained marketable title to the Thoroughbred House, and America's Wholesale Lender got a valid mortgage.

Plaintiffs' problems with Defendants were just beginning, however. At the closing, Plaintiffs leased the house back to Defendants, under a written one-year lease and option to purchase. The monthly lease payments were $5,328 (the amount of Plaintiff's monthly mortgage payment), which Defendants agreed to pay directly to the lender. Defendants made a few lease payments, but in general refused to pay as agreed or move out of the house. By the time of their eviction in 2015, Defendants had rented the Thoroughbred House for nine years and four months. During that time, they owed rent of about $600,000. Defendants only paid $73,702.

Plaintiffs counted on Defendants' monthly lease payment to service their mortgage. Defendants' failure to pay rent or move out caused Plaintiffs significant financial difficulty. On March 2, 2007, Bank of New York (the assignee of America's Wholesale Lender) filed a

---

[7] The transaction involved significant fraud. As indicated, Defendants did not own the house when they sold it to Plaintiffs. Plaintiffs were not aware of this key fact, nor was the mortgage lender. Somehow, Ms. Rojas was able to get the lender to close the loan, even though a non-fraudulent title commitment would have disclosed Defendants' inability to convey marketable title, and hence Plaintiffs' inability to grant a valid mortgage.

[8] Judge Mott found that Plaintiffs had no obligation, either to Abraham or Defendants, to repay the $78,000 loan.

[9] The redemption price was $567,440.

foreclosure action against Plaintiffs. The case was dismissed in February 2009, due to settlement. Bank of New York filed another foreclosure action in August 2016.[10]

4.   Plaintiffs' Bankruptcy and Adversary Proceeding, and Defendants' Fifth Bankruptcy Case.

On April 27, 2009, Plaintiffs filed a Chapter 11 case in the Western District of Texas, prompted by their difficulty paying the mortgage on the Thoroughbred House. Plaintiffs filed an adversary proceeding against Defendants in 2010, alleging claims related to the Thoroughbred House, the lease-purchase agreement, and other transactions between the parties (the "Texas Adversary Proceeding").

Ms. Rojas filed a pro se chapter 13 case on July 5, 2011, in the Western District of Texas (no. 11-31293, and bankruptcy case number five). She did not list Mr. Jayme as a non-filing spouse. The purpose of the filing is unclear. The case was dismissed on August 9, 2011, for failure to file a plan.

The Texas Adversary Proceeding was tried over six days in the summer of 2014. On September 5, 2014, Judge Mott issued 74 pages of proposed findings of fact and 104 pages of proposed conclusions of law. On January 27, 2015, the district court adopted the findings and conclusions, and entered a $997,354 money judgment against Defendants, plus pre- and post-judgment interest (the "Judgment").[11] The district court also awarded possession of the Thoroughbred House to Plaintiffs.

Among Judge Mott's findings was that Defendants were not credible witnesses. Judge Mott found that both Mr. Jayme and Ms. Rojas gave false trial testimony.[12]

5.   Defendants' Sixth Bankruptcy Case.

---

[10] The action is pending.
[11] The Fifth Circuit affirmed the Judgment on June 14, 2016. *See* 826 F.3d 250 (5th Cir. 2016).
[12] Judge Mott repeatedly states in his proposed findings of fact that he does not believe Defendants' testimony.

This case, filed March 3, 2015, is Defendants' sixth bankruptcy case. On the petition date, Defendants still lived in the Thoroughbred House, and still refused to pay rent to Plaintiffs. Plaintiffs finally succeeded in evicting Defendants on June 22 or 23, 2015.

6.      The Discharge Adversary Proceeding.

Plaintiffs brought this adversary proceeding on November 2, 2015, asserting that Defendants' obligation to them was nondischargeable, and that Defendants' discharge should be denied. The Court dismissed the nondischargeability claims, finding that the Texas Adversary Proceeding barred Plaintiffs from obtaining the requested relief. The Court tried the § 727 claims in January 2018.

7.      Defendants' Occupations and Income.

Mr. Jayme is a real estate agent, licensed in Texas and New Mexico. Mr. Jayme's estimate of his annual earnings ranged from a low of $8,400 (this case) to a high of $139,200 (third case).[13] According to Mr. Jayme's bankruptcy schedules, he has been a real estate agent for at least 25 years.

Despite this extensive background in real estate sales, Mr. Jayme represented to the Court that his only occupation was "city councilor," earning $700 a month. However, at some point post-petition, Mr. Jayme began working again as a real estate agent. The Court suspects there was little or no interruption in Mr. Jayme's real estate sales work. Whereas in his early chapter 13 cases Mr. Jayme deliberately inflated Defendants' asset values and income, in this case Defendants deliberately understated their asset values and income.

---

[13] Mr. Jayme's averred income went from $139,200 in March 2005 (schedule I in the third case) to $42,000 in November 2005 (schedule I in the fourth case). That's a drop of nearly $100,000 in just eight months.

Ms. Rojas is a mortgage loan broker, originator, and/or processor.[14] Her disclosed income also fluctuated widely, from a high of $108,000 in November 2005 (fourth case) to $0 (fifth case). Ms. Rojas disclosed her annual income in this case as $15,444, earned as a "Care Giver." Defendants' 2013 federal income tax return described Ms. Rojas' occupation as "property manager" and "housewife." Mr. Jayme admitted at trial that Ms. Rojas had never been a property manager. Ms. Rojas currently is working as a mortgage originator for Wells Fargo Bank. As with Mr. Jayme, the Court suspects that Mr. Rojas' career as a low-paid care giver ended shortly after the petition date, whereupon Ms. Rojas went back to brokering/originating mortgage loans.

8. <u>Defendants' Real Estate</u>.

Defendants have held interests in many parcels of real property over the years. The trial evidence indicates that Defendants at one time may have owned or held other interests in:

> 12413 Flora Alba Dr., El Paso, TX
> 2125 Villa Plata Dr., El Paso TX
> 4712 Woodrow Bean, El Paso, TX
> 947 Destella Rd., El Paso, TX 79924
> 1034 Wilshire St., El Paso, TX
> 1011 Ballymote Dr., El Paso, TX
> 4800 N. Stanton Dr., #18, El Paso, TX
> 4860 Excalibur Dr., El Paso, TX
> Mexico real estate
> 1141 Ranger St., El Paso, TX 79902
> 12400 Sun Willow Ave., El Paso, TX
> 6708 Stone Court, El Paso, TX 79924
> 10612 Maribeth Pl. El Paso TX
> 3600 Truman Ave., El Paso, TX
> 4257 Hampshire Lane, El Paso, TX
> 605 Greggerson Dr., El Paso, TX

At trial, Plaintiffs attempted to show that Defendants still owned one or more of these parcels. The evidence on this issue is confusing and weak. The Court finds that Plaintiffs did not

---

[14] Mr. Jayme's schedules in the first case state that in June, 2003, Rojas had been a "loan processor" with First Mortgage of El Paso for ten years.

carry their burden of proving that Defendants owned any real property on the petition date, nor that Defendants improperly conveyed or concealed any real property.

9.   Defendants' Names, Business Names, and Aliases.

Defendants have used many names, trade names, and aliases, including:

> Francisco J. Jayme
> Francisco Javier Jayme
> Javier Jayme
> Javier Jaime
> Jaime Rojas
> Javier Rojas[15]
> Alicia Jayme
> Alicia Rojas de Jayme
> Alicia Rojas-Jayme
> Alicia Rojas
> Monroj Investments
> Ludgate Investments, Inc.
> Ludgate Investments, LLC
> Northeast Patriot Plaza
> Group 11 Elements
> Infinity Capital, LLC
> Frontier Enterprises
> First Mortgage of El Paso

10.   Defendants' Petitions, Schedules, and SOFAs in their First Five Cases.

Exhibit A hereto summarizes some of the information contained on Defendants' bankruptcy petition, schedules, and SOFAs in each of their bankruptcy cases. The table makes clear that the information disclosed varied substantially. Overall, Defendants made little effort to ensure that their disclosures were complete and accurate. There are inexplicably wide variations in assets, liabilities, creditors, valuations, income, expenses, and occupations. Defendants' petitions, bankruptcy schedules, and SOFAs in their first five cases cannot be reconciled with their duty of accurate, full disclosure.

---

[15] Mr. James E. Thomas, a non-party fact witness, testified that he had known Mr. Jayme for "many, many" years. The name he knew Mr. Jayme by was Javier, not Francisco. When asked about a last name, Mr. Thomas responded "Rojas."

11.     <u>Problems in Debtors' Petition, Schedules, and SOFA in This Case</u>.

The petition, schedules, and SOFA in this case are similarly misleading and inaccurate.

a.     <u>Names and aliases</u>. Ms. Rojas is not properly named. Neither of the disclosed names ("Alicia Jayme" and "Alicia Reyes de Jayme") is Ms. Rojas' legal name, which is "Alicia Rojas-Jayme" or "Alicia Rojas de Jayme." In addition, Ms. Rojas conducts business in El Paso, Texas under the name Alicia Rojas. This name should have been listed, but was not.[16] At their § 341 meeting, the chapter 7 trustee pointed out to Defendants and their counsel that "Alicia Reyes de Jayme" was not Ms. Rojas' name. Defendant never bothered to amend their petition to list Ms. Rojas' real name.[17]

In addition, the trial testimony indicated that Mr. Jayme did business using the name Javier Rojas and/or Javier Jayme. Mr. Jayme should have added these names to his list of "All other names" in the petition.

b.     <u>Landlord judgment of possession</u>. In the Texas Adversary Proceeding, the district court ruled that Plaintiffs owned the Thoroughbred House and were entitled to immediate possession. Defendants should have certified on page two of the petition that Plaintiffs had a judgment of possession. They did not.

c.     <u>Prior bankruptcies</u>. Debtors failed to disclose Ms. Rojas' 2011 bankruptcy on page two of the petition.

d.     <u>Assets</u>.

       i.     <u>Real Property</u>. Debtors did not disclose their possessory interest in the

---

[16] When asked to state her name at trial, Rojas responded "Alicia Rojas." Her New Mexico driver's license and Resident Alien card both have her name as "Alicia Rojas de Mr. Jayme." In a motion Defendants filed in this adversary proceeding, Ms. Rojas refers to herself as, inter alia, Alicia Rojas De Jayme, and Alicia Rojas. She appears most comfortable with the name Alicia Rojas.

[17] Rojas should also have listed First Mortgage of El Paso as one of her former trade names.

Thoroughbred House, even though they lived there on the petition date, and resisted a turnover motion.

        ii.       <u>Cash on hand</u>. Defendants represented that they had no cash on hand on the petition date. The Court finds this inaccurate. The $20 figure for their savings account at the credit union also seems inaccurate.

        iii.       <u>Household goods</u>. Defendants valued their household goods at $5,000. In their earlier cases, the value fluctuated between a low of $10,000 and a high of $40,000.

        iv.       <u>Books; pictures, and art objects; CD collection, etc</u>. Defendants checked "none." In 2011, Ms. Rojas valued these items at $2,000. In the fourth case they were valued at $5,000.

        v.       <u>Clothes</u>. Defendant scheduled their clothes at $500. In 2011, Ms. Rojas valued the clothes at $3,500. Earlier cases had values of between $2,000 and $3,000.

        vi.       <u>Jewelry</u>. Defendants averred that they had no jewelry. In 2011, Ms. Rojas scheduled jewelry worth $2,500. In the third case, Mr. Jayme valued the jewelry at $10,000.

        vii.       <u>Stock and interests in businesses</u>. Defendants averred that they owned no stocks or other business interests. In their prior cases, they listed values of $40,000, $16,500, unknown, and $545,000, respectively, for such investment property. Defendants should have disclosed the existence of Ludgate Investments, LLC, as an asset (valued at $545,000 in 2011). Similarly, Defendants should have listed their interests in Monroj Investments and Infinity Capital, LLC. Even if Defendants thought these investments were worthless, they should have been scheduled.

        viii.       <u>Tax refunds</u>. Defendants did not disclose any tax refunds, even though their 2014 federal income tax return, filed just six weeks after their bankruptcy schedules, requested a

$7,858 refund. Based on Mr. Jayme's trial testimony (see below), Defendants may have had pre-petition tax refunds significantly greater than $7,858.

        ix.     <u>Licenses</u>. Mr. Jayme's professional licenses were not scheduled. While the licenses themselves have no resale value, they should have been disclosed, because they indicate that Mr. Jayme has earning capacity substantially greater than his city councilor stipend.

        x.     <u>Vehicles</u>. In the prior cases, Defendants valued their vehicles from $5,500 to $17,500. In this case, the vehicles were valued at $2,500.

        xi.     <u>Office equipment</u>. Defendants scheduled "none." In 2011, Ms. Rojas scheduled office equipment worth $500.

        xii.     <u>Machinery</u>. Defendants scheduled "none." In 2011, Ms. Rojas scheduled machinery worth $500.

   e.     <u>Creditors</u>.

        i.     <u>IRS Debt</u>. The scheduled IRS debt ($54,000) is questionable, as discussed below. Something, either the amount of the debt, Defendants' pre-petition tax refunds, or Defendants' post-petition earnings, does not add up.

        ii.     <u>StudentlLoan</u>. Defendants scheduled Mr. Jayme's student loan debt at $3,500. According to Mr. Jayme's testimony, however, he borrowed $4,050 two months before the petition date.

        iii.     <u>Debt to plaintiffs</u>. Defendants scheduled their obligations to Plaintiffs as a "business debt" of $750,000. The figure and characterization are wrong. On the petition date, Defendants owed Plaintiffs about $997,354. Furthermore, the debt is not a business debt. Defendants admit this elsewhere, because they took the position that their debs were primarily consumer debts.

iv.     Debt to Michael Nevarez. Defendants listed a $100,000 "legal services" debt owed to Michael Nevarez. There is no evidence of such a debt. Some of Defendants' obligation to Plaintiffs is for attorney fees,[18] but nothing is owed to Mr. Nevarez.

f.     Income. Defendants' 2014 income disclosed in their SOFA ($21,600) does not match their 2014 federal income tax return ($13,272). Mr. Jayme represented that his current monthly income on the petition date was $700 per month. His checking account statement, however, shows weekly deposits of $258, which would total a gross monthly income of at least $1,200. Finally, his testimony about paying the IRS debt with tax refunds could only be true if Defendants' income was much higher than disclosed.

g.     Expenses. Defendants disclosed on Schedule J that they pay $1,000 a month in rent for a house owned by Ms. Rojas' brother. At trial, Mr. Jayme testified that they are not paying rent. Given Defendants' failure to pay their mortgage and their lease, the Court finds it extremely unlikely that Defendants were paying $1,000 a month in rent on the petition date. In addition, Defendants claim their two oldest children as dependents (ages 25 and 23), even though the trial testimony indicates the children have their own jobs, their own cars, and in one case, a house in El Paso.

12.    Mr. Jayme's Trial Testimony.

Plaintiffs examined Mr. Jayme at some length. Some of his testimony lacked credibility:

a.     The air conditioner compressor at 105 Thoroughbred. When Plaintiffs were finally able to evict Defendants from the Thoroughbred Property, they discovered that one of the air conditioning compressors had been removed. In direct examination, Mr. Jayme testified that "there was nothing done with the air conditioning unit." The Court finds that an air conditioning

---

[18] The Texas district court awarded Plaintiffs $240,238 in attorney fees.

compressor had been removed with Defendants' knowledge and consent, shortly before they moved out of the Thoroughbred House. Mr. Jayme's testimony on this issue was false.

b. <u>Post-petition payment of the IRS debt</u>. Mr. Jayme testified that on the petition date, Defendants owed the IRS "at least $54,000." This was followed by:

> Ms. Monge: And how much do you owe now?
> Mr. Jayme: Right now I believe I don't know any money. I paid those liens off.
> Ms. Monge: How did you pay it off if you only made a thousand dollars a month?
> Mr. Jayme: The liens, all of the liens were paid off from my tax refunds for every year, probably since 2009. I, my tax refunds were applied to the debt. Every year I file, all of my tax refund would be applied to my debt. That's the way the IRS is. If you have any debt, even a dollar, they hold your tax refund; they keep it.
> Ms. Monge: How much was your refund in 2017?
> Mr. Jayme: I do not know. I have not filed my tax returns for 2017, and I have no idea. I don't not even know what my tax rate is or how the tax tables look this year.

This testimony contradicts Mr. Jayme's other testimony that Defendants have earned very little since their bankruptcy case was filed. Further, the testimony contradicts Defendants' bankruptcy schedules, which show no tax refunds. Something is materially wrong with Defendants' disclosures and testimony about their tax debt, tax refunds, and income.

c. <u>Scheduled Debt to Michael Nevarez</u>. Ms. Monge asked Mr. Jayme if he had a bill from Mr. Nevarez for $100,000. Mr. Jayme replied, "I believe my attorney does." The Court finds that Mr. Jayme knew Mr. Nevarez was not a creditor.

d. <u>Real Estate Licenses</u>. Ms. Monge questioned Mr. Jayme about his real estate licenses:

> Ms. Monge: How come you didn't list all of your licenses in your petition?
> Mr. Jayme: I believe my real estate license, I'm not sure, I just obtained it a few years ago, maybe two years ago, it may have been after the filing of the bankruptcy.

The Court finds that Mr. Jayme had real estate sales licenses on the petition date, knew he had the licenses, and was aware of his duty to disclose them.

e. <u>Mexico Real estate</u>. Mr. Jayme was asked about property he owned in Mexico:

Ms. Monge: Do you own a property in Mexico?

Mr. Jayme: No, I do not.

Ms. Monge: You sold it?

Mr. Jayme: I don't own any property, but I do not know which property you speak of.

Ms. Monge: The one that you put in the bankruptcy court petition in 2003

                                   [objection to relevance; overruled]

Mr. Jayme: I have not sold any property

Ms. Monge: So you still own . . .

Mr. Jayme: I don't own any property.

Ms. Monge: What about the project in Mexico where you were building like a hotel, it wasn't a hotel but it was a big project, that you invited me and my husband to participate?

Mr. Jayme: I do not own any property in Mexico.

Ms. Monge: Under a company?

Mr. Jayme: I do not own any interest in a company in Mexico.

Ms. Monge: So you didn't sell it, and you didn't own it, but you did have a property that is listed in your 2003 petition, worth half a million dollars.

Mr. Jayme: I may have, and I don't recall.

Mr. Jayme: You may have sold it?

Ms. Monge: I may have listed a property on my bankruptcy petition, but I don't exactly recall.

[court] Do you have a copy of the document [copy produced]

Mr. Jayme: It may have been land owned by my family or my wife, but I don't have any property currently.

Ms. Monge: What happened to it?

Mr. Jayme: I can tell you honestly that I did not sell this land. I am assuming that title was transferred to someone else.

This testimony is not credible. In 2003, Mr. Jayme averred that he owned $500,000 of Mexico real estate. In 2005, Mr. Jayme averred that he owned $50,000 of Mexico real estate. In 2015, Mr. Jayme averred that he owned no Mexico real estate. At trial in early 2018, Mr. Jayme testified that he may have owned Mexico real estate, but could not recall. None of this is credible. The Court finds that Mr. Jayme's testimony about the Mexico property was false.

       f.    <u>The Javier Jaime alias</u>. Mr. Jayme testified that his only name is Francisco Jayme. However, two 1099s attached to Defendants' 2013 federal income tax return are issued to "Javier Jaime." In addition, James Thomas testified that he had had known Mr. Jayme for years, and knew him only as Javier, never as Francisco. Mr. Thomas also testified that Mr. Jayme went by the name

Javier Rojas.

g.    Cumis Mutual Insurance Claim. Mr. Jayme testified that he knew nothing about the $15,376 scheduled debt to Cumis Mutual Insurance, c/o Investigation & Recovery. The claim appears to be to recover insurance money paid to Defendants. The Court finds that Mr. Jayme's testimony on this point is not credible. If an insurance company alleges that it paid a claim in error or because of fraud, the insured is well aware of it.

h.    605 Greggerson house. Ms. Monge questioned Mr. Jayme about an El Paso house with a street address of 605 Greggerson Drive, which had been owned at one point by his son, Marco Jayme. When she asked Mr. Jayme where Marco Jayme got the property, Mr. Jayme initially testified that he did not know. When pressed, Mr. Jayme admitted he knew Ms. Rojas had deeded the property to their son. Mr. Jayme's first answer was not truthful.

10.    Ms. Rojas' Trial Testimony.

When asked why she did not disclose her 2011 bankruptcy case in this case, Ms. Rojas responded that the 2011 case was filed by Ludgate Investments, LLC, rather than by her personally. That clearly is not correct. The petition names the debtor as "Rojas-Jayme, Alicia." The type of debtor was "individual," and the case was filed under chapter 13. Ms. Rojas claimed New Mexico exemptions for some of the scheduled property. The Court finds that Ms. Rojas' testimony on this issue was not truthful.

## II.    DISCUSSION

A.    727(a)(4) (False Oath).

Under 11 U.S.C. § 727(a)(4), a debtor is not entitled to receive a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;
(B) presented or used a false claim;

-15-

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

"In order to deny a discharge pursuant to [§727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact." *Bishop v. Mulholland (In re Mulholland)*, 2011 WL 4352293, at *4 (Bankr. D.N.M.), *citing Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997).

A false oath within the meaning of § 727(a)(4) may include omissions from the debtor's petition, schedules, or statement of affairs. *See In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990) (acknowledging that "an omission of assets from a Statement of Affairs or schedule may constitute a false oath under section 727(a)(4)(A)") (citation omitted). Debtors have a duty to carefully and accurately complete their statements and schedules, especially since they sign them under penalty of perjury. *In re Vigil*, 414 B.R 743, 750 (Bankr. D.N.M. 2009).

"The fundamental purpose of § 727(a)(4) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 113 (Bankr. D. Kan. 2011) (citing *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010); *see also In re Bushey*, 568 B.R. 821, 830 (Bankr. D.N.M. 2017) (creditors should not have to "dig out the truth").

A false oath is "material" if it bears a relationship to debtor's estate or concerns discovery of assets or existence of disposition of debtor's property. *In re Calder,* 907 F.2d 953, 955 (10th Cir. 1990), quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984); *In re Garland*, 417 B.R. 805, 814 (10th Cir. BAP 2009) (same); *In re Sears,* 246 B.R. 341, 347 (8th Cir. BAP 2000) (same).

"Bankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee." *Garland*, 417 B.R. at 814-15, quoting *Morrel, West & Saffa, Inc. v. Riley (In re Riley)*, 128 B.R. 567, 570 (Bankr. N.D. Okla. 1991).

"[T]he opportunity to obtain a fresh start is ... conditioned upon truthful disclosure." *Id.* "The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case." *In re Retz*, 364 B.R. 742, 759 (Bankr. D. Mont. 2007), citing Norton Bankruptcy Law and Practice 2d § 74.11 (1997).

"A debtor's petition, schedules, statement of financial affairs, statements made at a 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4)." *In re Butler*, 377 B.R. 895, 922 (Bankr. D. Utah 2006). "The same holds true for deposition testimony and testimony at other hearings during the course of the bankruptcy case." *Id.* (citations omitted). The false oath also need not be an affirmative misstatement; knowing and fraudulent omissions will also suffice. *Id.* (citations omitted).

> The Court is mindful that "on the issue of the alleged 'false oaths,' the credibility of the bankrupt is a very important factor." . . . [T]the Bankruptcy Court, which had an opportunity to observe debtors' demeanor and testimony firsthand, found that debtors demonstrated an indifference and disregard of the Bankruptcy Code. . . . This finding was not clearly erroneous. After an independent review of the record, this Court reaches the same conclusion. For example, in addition to the numerous omissions on debtors' Schedules and other filings, the testimony at the hearing in Bankruptcy Court demonstrates that Mr. Moreo was evasive when questioned by opposing counsel. . . . Moreover, as discussed *infra,* there was evidence that debtors failed to disclose additional assets . . . .

*In re Moreo*, 437 B.R. 40, 63–64 (E.D.N.Y. 2010).

"The problem in ascertaining whether a debtor acted with fraudulent intent is difficult because, ordinarily, the debtor will be the only person able to testify directly concerning his intent

and he is unlikely to state that his intent was fraudulent. Therefore, fraudulent intent may be deduced from the facts and circumstances of a case." *Garland,* 417 B.R. at 815, citing *Calder*, 907 F.2d at 955-56. "[R]reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *Garland,* 417 B.R. at 815, citing *Cadle Co. v. King (In re King),* 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002). "[M]ere mistake or inadvertence is not sufficient to bar a debtor's discharge under § 727." *Garland*, 417 B.R. at 815; *In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("we must not penalize the debtor for an inadvertent mistake").

The Court finds and concludes that Defendants' discharge should be denied under § 727(a)(4) because Defendants made false oaths and gave false trial testimony about material facts, with fraudulent intent.

      1.    <u>Names and aliases</u>. As discussed above, Defendants' disclosure of their names, trade names, business names, and aliases was materially inadequate. A debtors' failure to disclose all aliases on the petition can be sufficient to deny the debtor's discharge under 11 U.S.C. § 727(a)(4), if the omission was made with the requisite intent to defraud. *In re Whitaker*, 2017 WL 354314, at *7 (Bankr. D.N.M.)*,* citing *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149 (Bankr. D. Mont. 1998) (discharge denied based on debtor's false oath in failing to list her current, married name, and instead listing her maiden name as the only name she was known by). The purpose of listing all aliases on the petition is to allow creditors to confirm whether the debtor is a person who owes them a debt. *Whitaker*, 2017 WL 354314, at *7.

> [A] debtor's failure to disclose his or her current name is material in that it has a direct impact on the creditors' and the Trustee's ability to discover assets and or business dealings. This case highlights an obvious and fundamental maxim in bankruptcy—that providing false information under oath in a bankruptcy proceeding is not a matter to be taken lightly. *See e.g., Tully,* 818 F.2d 106, 112 (1st Cir.1987) (stressing that sworn statements in bankruptcy schedules "must be

regarded as serious business" because "the system will collapse if debtors are not forthcoming"); *In re Nazarian,* 18 B.R. 143, 146 (Bankr. D. Md. 1982) (noting that a creditor need not actually rely on the false statement). As previously noted by this Court, [t]he primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely upon it without the need for the Trustee or other interested parties to dig out the true facts through examinations or investigations. *Bastrom,* 106 B.R. at 227.

*In re Schmitz*, 224 B.R. 149, 151 (Bankr. D. Mont. 1998). The Court finds that Defendants, with fraudulent intent, omitted several key names from their petition, including Alicia Rojas, Alicia Rojas de Jayme, Alicia Rojas-Jayme, Javier Jayme, and Javier Rojas.

2.    Taxes and tax refunds. Defendants' disclosures related to their federal income tax debt, pre-petition tax refunds, and/or post-petition earnings were materially false. Defendants should have disclosed their 2014 income tax refund. All tax refunds based on a debtor's prepetition income or loss are estate property, regardless of when they are paid. 11 U.S.C.A. § 541(a); *In re Lamey*, 574 B.R. 240, 248 (Bankr. D.N.M. 2017). A Chapter 7 debtor's failure to disclose tax refunds is a material misrepresentation warranting denial of the discharge. *See Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). If Defendants had other pre-petition tax refunds, they should have disclosed those as well. Furthermore, as mentioned above, Mr. Jayme's testimony about the IRS claim and its post-petition payment could not be true unless his schedules and other statements are false. Defendants' statements and omissions regarding their taxes and tax refunds were material, intentional, false, and fraudulent.

3.    Ms. Rojas' 2011 bankruptcy case. Defendants' failure to disclose Ms. Rojas 2011 bankruptcy case was a serious omission. *See, e.g. In re Everett*, 2010 WL 4105458, at *3 (Bankr. N.D. Ohio) (dismissing debtors' case with prejudice to discharging in a later case any debts that could have been discharged, because debtors did not disclose a prior case). The Court finds that the omission was intentional, and was done with fraudulent intent.

-19-

4.     <u>Possessory interest in the Thoroughbred House</u>. Debtors lived in the Thoroughbred House on the petition date, and refused to move out until evicted by the sheriff. "'As § 727(a)(4)(A) makes clear, '[t]he Code requires nothing less than a full and complete disclosure of any and all apparent interests of any kind.'" *Sears v. Sears*, 542 B.R. 463, 478 (D. Neb. 2015), *aff'd, Sears v. Sears*, 863 F.3d 980 (8th Cir. 2017), quoting *Korte v. United States (In re Korte),* 262 B.R. 464, 474 (8th Cir. BAP 2001); see also *Fokkena v. Tripp (In re Tripp),* 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) (same). Paragraph 14 in Debtors' statement of financial affairs required them to "list all property owned by another person that the debtor holds or controls." Debtors checked the box "None." Debtors should have disclosed their possessory interest in the Thoroughbred House. Their failure to do so was either intentional, or else was done with reckless indifference to the truth.

5.     <u>False trial testimony</u>. Mr. Jayme gave false trial testimony, as discussed above. To a lesser extent, Ms. Rojas did also. For purposes of § 727(a)(4)(A), a false oath may include false testimony at a § 341 meeting, hearing, or trial. *In re Butler*, 377 B.R. 895, 922 (Bankr. D. Utah 2006); *In re Self*, 325 B.R. 224, 245 (Bankr. N.D. Ill. 2005) (statements made at the § 341 meeting and answers to interrogatories); *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) (§ 727(a)(4) applies to "a false statement by the debtor at the examination during the court of the proceedings"); *In re Korte*, 262 B.R. 464 (8th Cir. BAP 2001) (false testimony at the § 341 meeting). The Court finds and concludes that Defendants' false trial testimony was given with fraudulent intent, and was sufficiently material to constitute a false oath under § 727(a)(4)(A).

6.     <u>Other omissions and misrepresentations</u>. Overall, reviewing the many errors, omissions, and misrepresentations in Defendants' petition, schedules, SOFA, and trial testimony, the Court is left with the firm conviction that Defendants care little for the truth unless the truth coincides with their perceived economic interests. When the two coincide, Defendants will tell the

truth. Otherwise, Defendants have no problem omitting, twisting, shading, and misrepresenting the truth. The Court finds and concludes that Defendants went well over the line that separates innocent, good faith errors and omissions from intentional misrepresentations and false oaths. The false oaths were material and made with fraudulent intent.

The Court's conclusion about Defendants' veracity is bolstered by the lengthy bankruptcy, foreclosure, and litigation history outlined above. Their long history of misrepresentations to Plaintiffs, mortgage lenders, bankruptcy courts, bankruptcy trustees, creditors, and others culminated in this case and this adversary proceeding. Defendants could have obtained a discharge by changing their habit of dissimulation and making the full, fair, and honest disclosures required of bankruptcy debtors. They did not.

A.     §727(a)(2)(a) (Transferred or Undisclosed Assets).

Plaintiffs also argue for denial of the discharge under § 727(a)(2)(A). To prevail, Plaintiff must show, by a preponderance of the evidence, that "(1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the [debtor], (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor." *In re Gordon*, 526 B.R. 376, 388 (10th Cir. BAP 2015) (alteration in original), *quoting Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997).

"Omission of property from verified schedules may be both a false oath and a concealment." 6 *Collier on Bankruptcy* ¶ 727.04[2] at 727–39 (16th ed.). *See also Keeney v. Smith (In re Keeney),* 227 F.3d 679, 685 (6th Cir. 2000) (affirming the bankruptcy court's decision denying debtor's discharge under §§ 727(a)(2) and (a)(4), based on omission of valuable estate property from debtor's bankruptcy schedules); *In re Capra,* 2016 WL 5106994, at *10 (Bankr. N.D. Ohio) (fraudulent intent under § 727(a)(4)(A) and fraudulent intent under § 727(a)(2)(A) are

practically identical); *In re Sanders,* 128 B.R. 963, 972 (Bankr. W.D. La. 1991) (citing Collier and denying debtor's discharge under §§ 727(a)(2)(A) and 727(a)(4)); *In re Voccia*, 477 B.R. 625, 633 (Bankr. E.D. Va. 2011) (§ 727(a)(2) and § 727(a)(4) discharge exceptions usually go hand in hand because a debtor who fraudulently conceals assets in the petition has also necessarily made a false oath by signing the petition).

Here, Defendants failed to schedule their income tax refund(s), which apparently were enough to satisfy their $54,000 IRS tax liability. The refunds were a material asset. The Court finds that Defendants omitted the asset with the intent to hinder, delay, or defraud creditors. The Court finds and concludes that Defendants omission constitutes a fraudulent concealment of estate property, as defined in §727(a)(2)(A). Defendants' discharge should be denied under this section as well.

## III.    CONCLUSION

A bankruptcy discharge is a privilege, not a right. Debtors who play fast and loose with the truth are not eligible to receive a discharge. Here, the evidence shows that Defendants made false oaths in their bankruptcy petition, schedules, and SOFA, and gave false trial testimony, all about material facts and with the requisite fraudulent intent. At least one material asset was fraudulently concealed. Pursuant to §§ 727(a)(2)(A) and (a)(4)(A), Defendants are not entitled to a discharge. A separate judgment will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: June 29, 2018

Copies to:

Joe and Rosana Monge
P.O. Box 13051
El Paso, TX 79912

Francisco and Alicia Jayme
103 Horseshoe Ct.
Santa Teresa, NM 88008

## EXHIBIT A

| Case No. | 03-31671 | 04-17779 | 05-10619 | 05-51020 | 11-31293 | 15-10504 |
|---|---|---|---|---|---|---|
| Filing date | 6/27/2003 | 10/25/2004 | 1/31/2005 | 11/1/2005 | 7/5/2011 | 3/3/2015 |
| Dismissal date | 7/22/2004 | 1/19/2005 | 7/26/2005 | 12/22/2005 | 8/9/2011 | N/A |
| Filer | Francisco Javier Jayme | Francisco Javier Jayme | Francisco Javier Jayme | Francisco Javier Jayme | Alicia Rojas-Jayme | Francisco J. Jayme and Alicia Jayme |
| Name of Non-filing spouse | SOFA #16 says no spouse | Alicia Rojas | Alicia Jayme | Alicia Jayme | Not disclosed | N/A |
| Other Names Used by Debtor | Francisco J. Jayme- Real Estate Agent | Infinity Capital LLC; Frontier Enterprises | Infinity Capital LLC; Frontier Enterprises | Javier Jayme; Infinity Capital LLC; Frontier Enterprises | Ludgate Investments | Alicia Rejas de Jayme; Monroj Invest.; NE Pat. Plaza; Ludgate Invest. |
| Real estate | 7 parcels (incl. Thoroughbred House and $500,000 Mexico land), worth $668,334 | No Schedules | 10 parcels, (incl. Thoroughbred House and $50,000 Mexico land) worth $1,263,500 | 4 parcels, (incl. Thoroughbred House; no Mexico land) worth $992,679 | 2 parcels; no Thoroughbred House; no Mexico land, worth $552,500 | None |
| Cash | $0 | No Schedules | $0 | $200 | $275 | None |
| Checking/savings accounts | $10 | No Schedules | $500 | $25,000 | None | $20 |
| Utility deposits | None | No Schedules | None | $600 | $125 | None |
| Household goods | $10,000 | No Schedules | $40,000 | $17,420 | $19,500 | $5,000 |

| Case No. | 03-31671 | 04-17779 | 05-10619 | 05-51020 | 11-31293 | 15-10504 |
|---|---|---|---|---|---|---|
| Books; pictures | $0 | No Schedules | $2,000 | $5,000 | $2,000 | None |
| Wearing apparel | $2,500 | No Schedules | $2,000 | $3,000 | $3,500 | $500 |
| Jewelry | None | No Schedules | $10,000 | none | $2,500 | None |
| Firearms | 4 rifles ($400 value total) | No Schedules | 4 rifles ($400 value total) | Customary sports & hobby equipment ($2,500) | None | 3 rifles ($300) |
| Stock/ business interests | $40,000 | No Schedules | $16,500 | unknown | $545,000 (Ludgate Invest.) | None |
| Accounts receivable | $35,500 | No Schedules | none | None | None | None |
| Other debts | $75,000 | No Schedules | None | None | None | None |
| Other claims | $1.00 | No Schedules | none | none | None | None |
| Licenses | Real estate; notary public | No Schedules | none | none | None | None |
| Vehicles | '02 Chrys. Voyager; '96 Pont. Gr. Am; '02 Kawasaki ($17,500 total) | No Schedules | '02 Chrys. Voyager; '96 Pont. Gr. Am; '02 Kawasaki ($12,000 tot.) | '90 Dodge Ram; '02 Kawasaki ($5,500 tot.) | '06 GMC pickup ($8,500) | '92 F-250' '94 Dodge Caravan ($2,650 tot.) |
| Office equipment | None | No Schedules | None | None | $500 | None |
| Machinery | None | No Schedules | None | None | $500 | None |

| Case No. | 03-31671 | 04-17779 | 05-10619 | 05-51020 | 11-31293 | 15-10504 |
|---|---|---|---|---|---|---|
| Assets | $1,660,421 | No Schedules | $1,346,900 | $1,051,900 | $1,134,900 | $8,470 |
| Liabilities | $725,219 | No Schedules | $847,181 | $813,866 | $844,200 | $935,468 |
| Net equity | $935,202 | No Schedules | $499,719 | $238,034 | $290,700 | ($926,998) |
| Thoroughbred House | $675,000 | No Schedules | $660,000 | $775,000 | None given | N/A |
| Mortgage on Thoroughbred House | $466,500 | No Schedules | $465,000 | $630,000 | None given | N/A |
| Combined Monthly Income | $10,000 | No Schedules | $14,600 | $12,500 | $1,500 | $1,987 |
| Combined expenses | $8,000 | No Schedules | $11,425.80 | $10,773 | $1,192 | $2,796 |
| Net monthly income available for creditors | $2,000 | No Schedules | $3,174.20 | $1,727 | $308 | ($809) |
| Jayme occupation | Real estate agent (10 years) | No Schedules | Realtor | Real estate salesman | Real estate sales | City councilor |
| Rojas occupation | Loan processor (10 years) | No Schedules | Mortgage Broker/owner | Mortgage broker | Real estate investor | Care giver |
| Prior cases disclosed | N/A | None | 04-17779 | None originally, but an amendment disclosed the first and third cases | N/A | none |